463 A.2d 1108

**COMMONWEALTH of Pennsylvania**

v.

**Hiram STORES, a/k/a Richard Rogers, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 22, 1983.

Filed July 22, 1983.

Douglas James Wright, Girard, for appellant.

Michael J. Veshecco, District Attorney, Erie, for Commonwealth, appellee.

Before SPAETH, BROSKY and JOHNSON, JJ.

SPAETH, Judge:

This is an appeal from a judgment of sentence for theft and criminal conspiracy. Appellant argues that the lower court erred in refusing to grant his motion in arrest of judgment.[1] We agree and therefore vacate the judgment of sentence and order appellant discharged.

The charges arise from a theft of jewelry. At the close of the Commonwealth's case, counsel for appellant demurred to the evidence. When the trial judge overruled the demurrer, counsel offered no evidence. The jury returned a verdict of guilty on both counts—theft by unlawful taking, and criminal conspiracy.

On September 25, 1980, appellant filed a "boiler-plate" Motion for New Trial and/or Arrest of Judgment,[2] and on December 2, 1980, a Supplement to the Motion stating that "[i]t was error for the trial court to refuse to grant the defendant's demurrer to the Commonwealth's evidence presented in this case as to the charges of Conspiracy and Theft by Unlawful Taking." On December 9, 1980, the

1. Appellant also argues that the lower court erred in permitting the jury to see a photograph, and in imposing an excessive sentence. We do not reach either of these arguments.

2. The reasons assigned in the motion were:
 1. The verdict is contrary to the evidence.
 2. The verdict is contrary to the weight of the evidence.
 3. The verdict is contrary to the law.

lower court denied the Motion for New Trial and/or Arrest of Judgment, and on February 6, 1981, imposed sentence.

–1–

The Commonwealth argues that appellant has waived his argument that the lower court erred in refusing to grant his demurrer because of his "failure to specifically raise this issue and the grounds for it in his post-verdict motion." Brief for Commonwealth at 1, 3–5. In the course of this argument the Commonwealth states that "appellant in this case did not file any additional or supplemental reasons in writing in addition to this Motion [*i.e.*, the "boiler-plate" motion]." *Id.* at 3. This statement is contradicted by the record, which, as we have just indicated, contains a Supplement to the Motion, assigning as error the lower court's refusal to grant appellant's demurrer. In any event, we have recently held that a boiler-plate motion preserves a general claim of insufficiency, *Commonwealth v. Holmes*, 314 Pa.Super. 611, 461 A.2d 872 (1983) (boiler-plate motion held in compliance with Pa.R.Crim.P. 1123; also held, such motions will not be in compliance with rule if filed 60 days after June 10, 1983).

–2–

In deciding whether the evidence was sufficient to support appellant's conviction, we must regard the evidence in the light most favorable to the Commonwealth. *Commonwealth v. Edwards*, 493 Pa. 281, 426 A.2d 550 (1981); *Commonwealth v. Galloway*, 302 Pa.Super. 145, 448 A.2d 568 (1982). So regarded the evidence may be summarized as follows.

On February 22, 1980, sixteen diamond rings, worth $11,-700 retail, were stolen from the jewelry department of Kaufmann's Department Store in Erie. The rings were on display in a case with a glass top. The thief, or thieves, pried open the glass top with some sort of sharp instrument, separating the top from the metal frame to which it was glued, and then reached inside the display case. No one saw the theft occur; the evidence that appellant was the thief was circumstantial.

The principal Commonwealth witness was Marianne Trott. She was the sales clerk on duty in the jewelry department on February 22d. At about 6:30 p.m., appellant and a female companion entered. Ms. Trott offered to show them some items, but they said they were just looking. Ms. Trott followed them around, and after "about fifteen or twenty minutes," N.T. 22, 81, they left. "[W]ithin a half hour," *id.* at 9, they returned. Ms. Trott didn't "go right over to them again because they said they weren't buying," *id.*, but she saw them go over to the diamond case, *id.* She "could kind of see them leaning over [the case]," *id.* at 10, with "their heads together," *id.* at 11. Ms. Trott said she "[didn't] remember what happened after that," *id.* at 9, but that appellant and his companion "must of left" because "about a half hour later," *id.* at 10, while waiting on another customer she "happened to glance at the [diamond] case" and saw that "[t]he rings weren't there and I knew they had to be there because they were there when I came into work," *id.*

Upon discovering the loss, Ms. Trott called William Buesink, the Kaufmann's security manager. He checked the contents of the diamond case against the "inventory of the diamonds ... put in the case at the beginning of the day, and ... checked that against the receipts," *id.* at 49, and determined that sixteen diamond rings were missing, *id.* Officer Richard Figaski arrived at the store "shortly after 7:00 p.m." *Id.* at 37. He examined the diamond case, and determined from scratch marks on the metal frame and the glass top that the top had been pried loose with some sort of sharp instrument. The marks "were fairly clean in that there was no dirt accumulated in them and fairly shiny marks which usually indicates they were fresh." *Id.* at 42. Detective Sergeant Richard Nagoski interviewed Ms. Trott and on the basis of her description, appellant was arrested. *Id.* at 54.

Ms. Trott's identification of appellant was more than adequate. It is therefore established that appellant and his companion were in the store, and returned, as Ms. Trott

testified. The issue is whether they took the diamond rings. More fully stated, the issue is whether the circumstances proved by the Commonwealth fit so tightly together as to exclude beyond a reasonable doubt the possibility that someone else had taken the rings. *Commonwealth v. Prado*, 481 Pa. 485, 393 A.2d 8 (1978) (circumstantial evidence sufficient for conviction if inferences arising therefrom establish facts beyond reasonable doubt); *Commonwealth v. Axe*, 285 Pa.Super. 289, 292, 427 A.2d 227, 229 (1981); (Commonwealth entitled to prove case entirely by circumstantial evidence but circumstances must fit so closely together as to justify finding of guilt beyond reasonable doubt); *Commonwealth v. Patterson*, 257 Pa.Super. 206, 390 A.2d 784 (1978) (*ibid.*).

■ In overruling appellant's demurrer to the evidence, the trial judge remarked, "It's close. I think it's awfully close. You may be right, but I'm going to overrule you at the present time." N.T. 57. This ruling is entirely understandable; the judge did not have the benefit of a transcript, and it is often the better course to resolve doubts in favor of submitting the case to the jury. We are satisfied, however, that when one examines the transcript, one must conclude that the evidence was insufficient to establish beyond a reasonable doubt that appellant and his companion took the rings, and that appellant's motion in arrest of judgment should therefore have been granted.

The weakness of the Commonwealth's circumstantial proof may best be seen by considering what Ms. Trott did not say in her testimony. Had she been able to testify, first, that shortly before appellant and his companion entered the jewelry department, she had seen the diamond rings in the display case, and second, that she knew that customers who entered later had not taken the rings, then the jury could reasonably infer that even though no one saw appellant and his companion take the rings, they must have taken them: they were in the jewelry department; they had the opportunity to take the rings; and no one else had taken them. A tight circumstantial fit would have been estab-

lished. In fact, however, Ms. Trott's testimony failed to establish a tight fit.

In the first place, Ms. Trott didn't testify—she wasn't asked—when she had last seen the rings in the display case before appellant and his companion entered the jewelry department. Her only testimony on this point was that "they [the rings] were there [in the case] when I came into work." N.T. 10. She never said when she came to work. However, she said that appellant and his companion first entered the jewelry department at 6:30 p.m., *id.* at 4, 7, so that she must have been at work for some time. She did not notice that the rings were missing until after appellant and his companion had finally left: "Well, it was within an hour, but it was probably like a half hour [after they had left]." *Id.* at 17. Further in this regard, Mr. Buesick testified that "a strict inventory of the diamonds ... put in the case [had been made] at the beginning of the day ...." *Id.* at 49. Thus, the jury only knew that the rings were seen in the case at the beginning of the day and again at about 7:00 p.m., when they were found to be missing.

This gap in the proof might have been overcome if Ms. Trott had been able to testify that she knew that no one else who had entered the jewelry department during the day had taken the rings, but she didn't testify to that effect. Ms. Trott wasn't asked at all about persons who entered the department before appellant and his companion did. She was asked about persons who entered after they did. She said "[i]t was a slow evening .... A lot of people just come to look at the jewelry and things, but that night it was just kind of a slow time during the week, and at that hour there wasn't that many people there." N.T. 4. When she noticed the rings missing, she "was waiting on a customer," *id.* at 10; that was "about a half hour" after appellant and his companion had finally left, *id.* She "had waited on other customers, one or two, you know, and there was this one other woman that came in ...." *Id.* When asked, "Could it have been as many as five [persons waited upon

during this period]?" she replied, "I don't think so because it was a very slow evening." *Id.* at 17.

It is arguable that the jury could have reasonably inferred that none of these customers—perhaps three or four—could have taken the rings, for if they had tried to, Ms. Trott would have seen them do it. This argument is somewhat weak, however, for appellant and his companion were also waited upon by Ms. Trott, and she didn't see them take the rings. In this regard, Ms. Trott wasn't asked in what way she had waited on the few customers who came in after appellant and his companion had left—whether she showed them items or let them browse around, as she let appellant and his companion do.

Finally, and we believe this was the most serious gap in the Commonwealth's proof, Ms. Trott was unable to exclude the possibility that others had entered the jewelry department, unnoticed by her. Probably because it was a slow evening, Ms. Trott was to some extent occupied with other matters:

Q. During that period of time, do you recall exactly what you did?

A. No, I can't recall everything I did. I know I was listening to these tapes because we had to learn them [she also referred to "tapes" earlier in her testimony, N.T. 11; the record does not disclose, however, the nature of the tapes].

Q. Were you reading a book during that time?

A. I don't know. We had a book that went along with the tapes, but if I glanced at it, but mostly listening to these and seeing if customers came up because I was the only one there.

Q. But you were occupied doing other things during the time that these people [appellant and his companion] left the store and the time that you noticed that the diamonds were missing; is that right?

A. Yeah, I would have been probably straightening things around.

N.T. 22–23.

Ms. Trott further testified:

Q. Is there a parking lot right in back of Kaufmann's out on the outside?

A. Yes, on the other side of the street.

Q. Do people sometimes use Kaufmann's as an entrance to other parts of the Mall itself?

A. Possibly, yes.

Q. Well, you do have quite a bit of traffic through there don't you?

A. Yes.

Q. Now, in relationship to people just looking though, you have a pretty constant flow of people coming through that store is what I'm trying to ask you.

A. Well, there is moments they do, yes. It's not a steady flow, but there are people coming in and out now and then.

\*　　\*　　\*　　\*　　\*　　\*

Q. All right. Did you notice everyone that happened to walk through the store at the time?

A. Not everyone, no.

Q. So really there is just no way we have any idea how many people walked by the jewelry case during the time period involved, and by the time period, again I mean from the time the people left until the time you noticed the rings were stolen.

A. I couldn't say exactly, but some nights there is more people and sometimes there is less, and this night was a slow night.

Q. But there were a number of people that walked by which you might not of noticed; is that right?

A. Possibly.

N.T. 24–26.

The possibility that others had walked by, unnoticed by Ms. Trott, was enhanced by the fact that from her work counter, her view was partially blocked: "[T]here is a ledge that

they have a big flower thing on it at the time, and I believe it's just where you wouldn't take notice unless you were going to kind of look over .... " N.T. at 12.

In summary, then: The jury had evidence that appellant and his companion had had the opportunity to take the rings inasmuch as they had been in the jewelry department and had not been closely observed by Ms. Trott. But the jury also had evidence that other persons either had been or might have been in the jewelry department, and that at least some of these other persons also had had the opportunity to take the rings inasmuch as they too had not been closely observed—indeed, perhaps not observed at all—by Ms. Trott. No evidence tied any particular person to the missing rings. Apparently there were no fingerprints on the display case—at least, no evidence of any was offered. While Ms. Trott saw appellant and his companion looking at the rings, she didn't see them prying the case open, N.T. 23, nor "what they were doing with their hands if anything," *id.* at 11. Thus what the jury was left with was proof that appellant and his companion had been present at the scene of the theft of the rings—and so had other persons.

 While a criminal conviction may rest upon wholly circumstantial evidence, it " 'may not be based upon mere surmise or conjecture.' " *Commonwealth v. Berrios,* 495 Pa. 444, 449, 434 A.2d 1173, 1176 (1981) (quoting *Commonwealth v. Thomas,* 465 Pa. 442, 446–47, 350 A.2d 847, 849 (1976)). *See also Commonwealth v. Jones,* 298 Pa.Super. 199, 444 A.2d 729 (1982). Evidence of mere presence at or near the scene of a crime is precisely the kind of circumstantial evidence that does require surmise or conjecture. *Commonwealth v. Roscioli,* 454 Pa. 59, 309 A.2d 396 (1973); *Commonwealth v. Harrison,* 289 Pa.Super. 126, 432 A.2d 1083 (1981); *Commonwealth v. Lovette,* 271 Pa.Super. 250, 413 A.2d 390 (1979). Evidence of something more than presence at or near the scene of a crime is required to justify the conclusion that someone committed or participated in a crime. *See, for example, Commonwealth v. Everett,* 297 Pa.Super. 320, 443 A.2d 1142 (1982) (presence

plus aid to perpetrator with intent to promote perpetrator's act); *Commonwealth v. Lovette, supra* (presence plus possession of stolen goods and muddy shoes). Where the only evidence is evidence of presence at or near the scene of a crime, we have consistently held the evidence insufficient to establish guilt beyond a reasonable doubt. *See Commonwealth v. Goodman*, 465 Pa. 367, 350 A.2d 810 (1976) (presence at scene even when accompanied by flight does not establish guilt beyond reasonable doubt); *Commonwealth v. Stanley*, 453 Pa. 467, 470, 309 A.2d 408, 411 (1973) (presence at scene where screening over window had been bent held insufficient where no showing that anyone saw appellant tampering with window); *Commonwealth v. Garrett*, 423 Pa. 8, 13, 222 A.2d 902, 905 (1966) (presence at scene held insufficient absent other evidence of participation in robbery); *In re Amos*, 287 Pa.Super. 446, 430 A.2d 688 (1981) (presence a short distance from alleged perpetrator, with no other connection, held insufficient); *Commonwealth v. Smith*, 264 Pa.Super. 303, 399 A.2d 788 (1979) (only person seen standing within ten feet of window-smashing immediately after event held insufficient evidence of attempted burglary).

The judgment of sentence is reversed and appellant is discharged.