J-A18017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SHADI M. ABUOMAR | |
| Appellant | No. 1627 MDA 2014 |

Appeal from the Judgment of Sentence dated June 13, 2014
In the Court of Common Pleas of the 41st Judicial District,
Juniata County Branch
Criminal Division at No: CP-34-CR-0000120-2013

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:            **FILED OCTOBER 28, 2015**

Appellant Shadi M. Abuomar appeals from the June 13, 2014 judgment

of sentence[1] entered in the Court of Common Pleas of the 41st Judicial

District, Juniata County Branch (trial court), following a jury trial that

resulted in Appellant being found guilty of theft by unlawful taking of

---

[1] Appellant purports to appeal from the trial court's order denying his post-sentence motion.  Appellant's Brief at 2.  It is well-settled, however, that an appeal lies from the judgment of sentence, not the denial of the post-sentence motion.  ***See***, ***e.g.***, ***Commonwealth v. Pratt***, 930 A.2d 561, 562 n.1 (Pa. Super. 2007), ***appeal denied***, 946 A.2d 686 (Pa. 2008); ***Commonwealth v. Shamberger***, 788 A.2d 408 (Pa. Super. 2001), *appeal denied*, 800 A.2d 932 (Pa. 2002).  Accordingly, we have corrected the caption to reflect the June 13, 2014 judgment of sentence.  ***See Commonwealth v. Dreves***, 839 A.2d 1122, 1125 n. 1 (Pa. Super. 2003) (*en banc*).

movable property (firearms) under Section 3921(a) of the Crimes Code, 18 Pa.C.S.A. § 3921(a). Upon review, we affirm.

The facts and procedural history underlying this case are undisputed. Briefly, on June 24, 2013, Appellant was charged with theft by unlawful taking of firearms. The affidavit of probable cause accompanying the complaint reveals in part that Richard Lombardo was relocating from New York to Mifflintown, Pennsylvania. The company moving Lombardo's belongings from New York to Pennsylvania hired, among others, Appellant and Appellant's friend, Frank Mideaugh, for the day to assist with the move by transporting boxes from the moving truck to Lombardo's residence. At some point, Lombardo noticed that three handguns were removed from a gun box. When Lombardo confronted the movers, Appellant and Mideaugh got into Appellant's vehicle and fled the scene.

The case proceeded to a jury trial, at which both parties presented testimony. Wade Demanche first testified on behalf of the Commonwealth. He testified that he "ran" Liberty Moving and Storage (Liberty Moving) and was in Mifflintown because he was moving a family, later identified as the Lombardos, from New York. N.T. Trial, 3/27/14, at 24-25. Demanche testified that he had to deliver the Lombardos' furniture. *Id.* at 25. Specifically, he testified, "I had loaded [the furniture] in Long Island on Friday and I came out here for Saturday morning to deliver their furniture to their home." *Id.* Demanche further testified, "When I got here, there was no moving companies open to hire labor for the day, so I put an ad on

- 2 -

Craigslist to try and get help." *Id.* He explained that the Craigslist ad he posted specified that he "was looking for experienced movers to help unload a truck." *Id.* at 26. Demanche testified that he eventually hired three men, and promised to pay each of them $100 if they helped him unload the truck. *Id.* at 27-28. Demanche identified two of the hired men as Appellant and Mideaugh. *Id.* at 27-29.

Demanche testified that he and the three men eventually reached the Lombardos' house to unload the truck. *Id.* at 29. Describing the move, Demanche testified:

> We started unloading furniture into the house. Everybody seemed to be fine. It went on for a few hours and then [Appellant] and [Mideaugh], after a couple of hours, got really antsy and wanted to leave. Their demeanor seemed to change.
>
> . . . .
>
> Well, we were about halfway through and they said they put in enough hours. They were ready to leave, which wasn't the deal. The deal was a flat rate of a hundred rate [sic] to unload the truck. We were only about halfway done. It had only been a few hours. At that time [Appellant], you know, said he wanted to go to his car to get some gum. I didn't think nothing of it. He did that on three separate occasions.

*Id.* at 29-30. The first time Appellant went to his car, Demanche was in the truck from which he observed Appellant "[m]essing around with stuff under his seat." *Id.* at 30-31. Demanche testified that Appellant did the same thing minutes later when he returned to his car to retrieve cigarettes. *Id.* at 31. Twenty minutes later, according to Demanche, Appellant went to his car for the third time for reasons unknown to Demanche. *Id.*

Demanche testified:

The customer [(Lombardo)] came out of the house, approached me, and said I am missing three firearms; and I was like what do you mean? Because I didn't have any firearms in the truck. He had brought them in his own personal vehicle, and I didn't know they were in the house. And he said, "Listen. I just want them back, no police involvement." That's when he approached the rest of the crew that was there, and—

. . . .

[The crew was] all down by the back of the truck by the rail; and he said whoever has got my guns, just give them back and leave with no police involvement. At that time [Appellant] turned his back to everybody[.]

*Id.* Demanche then testified that "the gentleman that was with [Appellant] stated on three separate occasions just give him back the guns, and let's gut [sic] out of here that time." *Id.* at 31-32. Appellant's counsel objected based on hearsay and the trial court sustained the objection, directing the jury that it may not consider the statement. *Id.* at 32. Shortly thereafter, Demanche once again testified that "the crew was like, hey, give back the guns." *Id.* Appellant's counsel once again raised a hearsay objection, which the trial court sustained. *Id.* at 32-33.

Demanche testified that, when the crew was approached by Lombardo, Appellant "looked like he was trying to make a decision," because Appellant "stood there for a moment and then reached into his back pocket, grabbed his keys, and headed towards his vehicle." *Id.* at 33.

Describing what transpired next, Demanche testified:

Me and [Lombardo] both followed [Appellant] over towards his vehicle. [Lombardo] went to put his hands on the door to keep him from closing it. [Appellant] ripped the door out of [Lombardo's] hand. I went—the window was down. I went over to the car and I was going to try and stop him. [Appellant] started reaching for something under the seat. I didn't exactly see what it was. But with the mention of guns, I decided it was

- 4 -

best for me to back away. I took pictures of the car and of the gentlemen that [Appellant] was with.

*Id.* at 34. Demanche also testified that, before Appellant and Mideaugh left, they did not ask for payment for the work performed. *Id.* at 35. They were not paid. *Id.* Demanche testified that Appellant and Mideaugh left "in a real hurry." *Id.*

The Commonwealth next offered the testimony of Richard Lombardo, who testified that he and his wife were relocating to Mifflintown from Long Island, New York to retire. N.T. Trial, 3/27/14, at 48-49. To facilitate the relocation, Lombardo testified that he hired Liberty Moving, a subsidiary of United Van Lines. *Id.* at 50. Lombardo further testified that Liberty Moving was "supposed to load everything from New York into a truck and then bring it here and unload it and put it in the various rooms." *Id.* On June 22, 2013, Liberty Moving transported Lombardo's belongings to Lombardo's new residence in Mifflintown. *Id.* at 53. At the residence, Lombardo met Demanche and three workers who had been hired through Craigslist in Pennsylvania. *Id.* Lombardo testified he "was very upset to find out that they were hired off of Craigslist that morning." *Id.* Lombardo also testified that one of the workers hired through Craigslist was Appellant. *Id.* at 53-54.

Lombardo testified that Appellant introduced himself as "Michael." *Id.* at 54. Lombardo explained that his interaction with the workers principally consisted of directing them where in the house to unload the moved

belongings. *Id.* at 55. Lombardo testified that he was not satisfied with the way the move was going because he felt "uneasy with the actions of" Appellant and Mideaugh. *Id.* Lombardo explained: "It seemed like every time I walked into the garage one of them would start talking very very loud. If I went downstairs, [Appellant] would, you know, act a little – got very quiet and all of a sudden he would run up the stairs, so . . . ." *Id.* at 56.

Alarmed by Appellant and Mideaugh's behavior, Lombardo testified that he checked up on his wife and their belongings to make sure they were all right. *Id.* at 57. Lombardo testified that, in so doing, he noticed some open gun cases. *Id.* Lombardo testified that he "had three pistols. Two of the cases, gun cases, were open. Camera cases were open. A duffle bag was open and I noticed that the three handguns were missing." *Id.* With respect to the missing handguns, Lombardo testified that they were in the same hard case. *Id.* at 58. Describing the handguns, Lombardo testified that two were revolvers and the third "a nine millimeter automatic." *Id.* at 59.

Explaining why the handguns were inside the residence, Lombardo testified:

> They were in the back of my car in the trunk. And because the [moving] truck was right near my driveway of the new house, I didn't want to put [my] car in the way of the people moving my household goods. I had parked [my car] like a house away on the road, and I felt comfortable – uncomfortable that they were there, because they were supposed to be in my charge.

And I did a stupid thing. After an hour or so, I went to the trunk of my car and I took them out and I brought them inside the house, because I thought they would be more secure there than out in the road.

. . . .

I put them downstairs in the basement behind the stairs in a corner, and I covered them with a – you know I put other things around them so that they wouldn't look like they were gun cases. So that's why I put my camera case there and other things.

*Id.* at 59-60. Lombardo testified that when he brought the guns inside the house, he verified that they were in the case. *Id.* at 60.

Upon noticing that the guns were missing, Lombardo testified that he approached Demanche, stating, "I have some personal items missing and I want to talk to you and the three men that were there." *Id.* at 62. Lombardo testified that he then "went to the end of the driveway," where the workers were standing, to inform them that he was missing some items. *Id.* In response, Lombardo explained that Appellant and Mideaugh "were looking at each other and the other guy was saying something to [Appellant]. I didn't catch what he was saying and [Appellant] turned his back, put his hands in his pocket, got his keys out, and headed for his car." *Id.* at 63.

Lombardo testified that when Appellant got into his car, Lombardo dialed 911 and went after Appellant. *Id.*

I tried—[Appellant] had already gotten in the car and was closing his door. I tried to keep the door open, but I couldn't. I was in the wrong position. I don't know why, but I don't know why. But he slammed the door shut. The other guy ran to the car and said, "He's my ride. I have to go." He jumped in the car and [Appellant] was reaching towards like between the driver's seat and the passenger seat, and he put the car in gear and the

- 7 -

car was already in gear. They had already done that. [Appellant] just sped out and took off.

*Id.* at 63-64. Lombardo testified that he had not given permission to anyone that day to use the handguns.

On cross-examination, Lombardo acknowledged that he never saw Appellant handle one of the missing guns. *Id.* at 86. Lombardo also acknowledged that he was unsure whether anyone observed him moving the guns from his car to the house. *Id.* at 87. Lastly, Lombardo acknowledged that he suspected Appellant stole the handguns because Appellant ran away. *Id.* at 92-93.

Following testimony by Demanche and Lombardo, Appellant's counsel moved for a mistrial because of Demanche's hearsay statements that someone told Appellant to return the guns to Lombardo. *Id.* at 70. Appellant's counsel argued that "the cumulative effect of [the statements] on the jury is such that it will bias them to an extent that a cautionary instruction is inadequate[.]" *Id.* The trial court denied the motion for mistrial.

The Commonwealth thereafter presented the testimony of Trooper Stanley E. Sims, Jr. Trooper Sims testified that, on June 22, 2013, he responded to a report of stolen firearms and interviewed Lombardo and Demanche at the scene. *Id.* at 101-104. Trooper Sims testified that Lombardo gave him a license plate number, based on which Appellant was identified "as the guy that was driving" the vehicle. *Id.* at 105.

On cross-examination Appellant's counsel asked Trooper Sims whether "at [any time] that anybody said, give them back the guns, give them back the guns[.]" *Id.* at 108. Trooper Sims responded, "They might have. I don't recall." *Id.*

Eve Ellen Marie Brown, head custodian at Loyalsock Township School District, testified that, on August 23, 2013, she heard some loud shots while working in a classroom. *Id.* at 137-38. Ms. Brown testified that she observed an individual tossing "something over towards the tree," and then getting into a vehicle and driving off. *Id.* at 138-39. She testified that upon examining the area around the tree, she discovered a handgun. *Id.* at 139.

Trooper Tyson Havens, with the Pennsylvania State Police, testified he examined a recovered firearm and confirmed it was reported stolen and registered to Lombardo. *Id.* at 142-43. Trooper Havens testified that, although DNA evidence was retrieved from the handgun, it was not linked to Appellant. *Id.* at 143.

In response, Appellant presented the testimony of Mideaugh, who testified that, three hours into unloading the truck, Lombardo "just came out of the garage and said there's guns missing from his basement." *Id.* at 170. Mideaugh testified that no one responded to Lombardo's comment because everyone was "shocked." *Id.* He further testified that Lombardo's wife "started pointing a finger at" Appellant. *Id.* Mideaugh explained that Lombardo's wife blamed Appellant for the missing guns. *Id.* at 171. Describing what ensued, Mideaugh testified:

> Well, [Lombardo] started yelling at [Appellant] and, you know, the wife's yelling at him. So [Appellant] started going over to his car, you know, and I was like I didn't know what the hell to do, so I followed them over. He went to get in his car and [Lombardo] wouldn't let him. [Appellant] closed the door. I was, that's my ride I'm getting in too. I was scared and confused and we just left.

*Id.*

On cross-examination, Mideaugh acknowledged that they did not get paid for the work that day. *Id.* at 175-76.

Next, Appellant testified on his own behalf. Appellant testified that, during the move, he did not observe any gun cases at the Lombardo residence. *Id.* at 194. Appellant testified that, three-fourth of the way into the move, Lombardo approached Demanche, as the movers were all standing by the truck, to tell Demanche that Lombardo was missing some items. *Id.* at 198. Appellant testified that eventually Lombardo's wife started to point a finger at him and Lombardo began to accuse him of taking the items. *Id.* at 199-200. Specifically, Appellant testified:

> Lombardo turned to me and started pointing at me and saying, basically, you did it. I know you did and I want my stuff back.
>
> . . . .
>
> At this point, I didn't know what he was talking about. He was just saying I have some items missing, some stuff; and then at some point, he said that when he was talking about calling the police. He said that it was some pistols, I believe, he used.
>
> . . . .
>
> I just turned and, you know, I was just not really paying the situation any mind, because I didn't have anything to do with anything. I was standing there and [Lombardo] kept saying he was going to call the police. And I was, like, I don't mind, because—and then after a while, he just, when his wife started pointing at me, he started getting closer to me and started pointing his fingers and raising his voice.

- 10 -

And I started to get a little agitated, because somebody was accusing me and I just said, "Look, I don't know what the hell you're talking about. I don't have anything, you know." I had a tight shirt on. I don't—like you can see I don't have nothing. I said, "There's nothing in my car." And he kept insisting that he wanted to call the authorities and he kept getting closer and closer to me, raising his voice and more gesturing with his hands. At that point I just said, you know, I had enough and turned around and left.

. . . .

[Lombardo] tried to grab the [car] door handle and when he grabbed the door handle his hand must have slipped away or whatever and I closed the door and that was it.

*Id.* at 199-201.

On cross-examination, Appellant denied that he ever introduced himself to Lombardo as either Michael or Mike. *Id.* at 205-206.

Following trial, Appellant was found guilty of theft by unlawful taking. On June 13, 2014, the trial court sentenced Appellant to 21 to 60 months' imprisonment. Following the trial court's disposition of Appellant's post-sentence motions, Appellant timely appealed to this Court.

On appeal,[2] Appellant essentially raises two arguments for our review. First, Appellant argues that the Commonwealth did not present sufficient evidence to sustain his conviction for theft by unlawful taking of firearms. Second, Appellant argues that the trial court erred in denying his motion for

---

[2] To the extent Appellant argues the Commonwealth failed to establish a *prima facie* case, we reject such argument as meritless. Appellant here was convicted in a jury trial. *See **Commonwealth v. McCullough**,* 461 A.2d 1229, 1231 (Pa. 1983) (concluding the fact that the Commonwealth did not establish a *prima facie* case of robbery at the defendant's preliminary hearing was immaterial where the Commonwealth met its burden of proving the underlying offense at trial beyond a reasonable doubt).

mistrial because of the prejudicial hearsay statement made by Demanche in the presence of the jury.

We first address Appellant's contention that the evidence was insufficient to sustain a conviction for theft by unlawful taking. In support of his argument, Appellant points out that the Commonwealth failed to offer any evidence linking Appellant to the theft. Appellant's Brief at 15. Appellant thus argues that his conviction for theft hinges only on the Commonwealth's evidence that Appellant was present at the Lombardo residence and fled upon being informed of the missing personal items. *Id.*

"A claim challenging the sufficiency of the evidence is a question of law." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of *wholly circumstantial evidence*. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014) (emphasis added), *appeal denied*, 95 A.3d 275 (Pa. 2014). "This standard is equally applicable to cases where the evidence is circumstantial rather than

- 12 -

direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." **Antidormi**, 84 A.3d at 756 (citation omitted). "Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." **Id.** (citation omitted). To reiterate, credibility and weight of the evidence are both matters that are in the sole purview of the jury. Specifically, when considering whether or not the evidence was sufficient to prove each element of each charge beyond a reasonable doubt, we cannot assume the task of weighing evidence and making independent conclusions of fact. **Commonwealth v. Lewis**, 911 A.2d 558, 563 (Pa. Super. 2006) (citations omitted).

Section 3921(a) of the Crimes Code, relating to theft by unlawful taking of movable property, provides that "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S.A. § 3921(a).

We consistently have held that evidence of a defendant's presence at the scene of a crime and the defendant's subsequent flight therefrom, "standing alone, does not establish guilty beyond a reasonable doubt." **Commonwealth v. Goodman**, 350 A.2d 810, 811 (Pa. 1976) (citing **Commonwealth v. Roscioli**, 309 A.2d 396 (Pa. 1973)); **see also Commonwealth v. Hargrave**, 745 A.2d 20, 23-24 (Pa. Super. 2000) (concluding that evidence was insufficient to prove burglary where the evidence consisted of defendant's presence at the scene of crime along with

his flight after arrest), *appeal denied*, 760 A.2d 851 (Pa. 2000). In ***Hargrave***, this Court explained "[f]light does indicate consciousness of guilt, and a trial court may consider this as evidence, '***along with other proof***, from which guilt may be inferred.'" ***Hargrave***, 745 A.2d at 23 (emphasis added). We, however, cautioned that "this only holds true in cases in which the other evidence of guilt consists of ***more than mere presence at the scene***." ***Id.*** (emphasis added). Indeed, "mere presence on the scene both immediately prior to and subsequent to the commission of a crime and flight therefrom is not sufficient evidence to prove involvement in the crime." ***Id.*** at 23-24 (citation omitted); ***see also Commonwealth v. Stores,*** 463 A.2d 1108 (Pa. Super. 1983) (evidence of something more than mere presence at or near the scene of a crime is required to justify the conclusion that the defendant committed or participated in a crime). Thus, "[t]he additional element of flight, which is as consistent with fear as with guilt, does not convert presence into proof of guilt." ***Goodman***, 350 A.2d at 811 (citation omitted).

In ***Goodman***, a police officer observed the defendant emerge from a doorway that accessed both the rear door of a grocery store and a stairway to an apartment above the grocery store. The officer ordered the defendant to stand against the wall next to another individual, whom the officer had caught emerging from the rear door of the grocery store carrying a box of frozen meat. When the other man threw the box of meat at the police officer and fled, the defendant fled in the opposite direction. The defendant

subsequently was caught, and no inculpatory evidence was found after a search of his person. Our Supreme Court found the evidence was insufficient to support a conviction for burglary and larceny because the defendant could have come from the apartment and he was not linked to the man carrying the box. *Goodman*, 350 A.2d at 811. Thus, in reversing this Court's decision, the Court concluded that "the evidence is as consistent with the inference that [the defendant] innocently happened upon the scene and fled out of fear as it is with the inference that [the defendant] was a participant in the burglary." *Id.* at 812.

In *Commonwealth v. Keller*, 378 A.2d 347 (Pa. Super. 1977), the Commonwealth presented evidence that at 7:10 a.m., a witness observed the appellant and two other young men standing around a vacuum cleaner at a car wash. *Keller*, 378 A.2d at 349. When the witness approached the men, the appellant jumped into a car and left the scene. *Id.* When the witness examined the vacuum cleaner, he noticed that the coin box to one vacuum cleaner was damaged and that another coin box was missing. *Id.* The witness contacted the police and the appellant was arrested three days later. *Id.* In reviewing whether the evidence was sufficient to affirm the appellant's conviction for theft, we explained that "[t]he mere presence of an individual at the scene of a crime is not a sufficient circumstance upon which guilt may be predicated. Moreover, the additional element of flight, which is as consistent with fear as with guilt, does not convert presence into proof of guilt." *Id.* (citations omitted). We noted that the Commonwealth failed to

introduce evidence tending to show that the appellant had tempered with the coin boxes or taken anything from them. *Id.* Thus, based on the evidence in that case, we concluded that the evidence of the appellant's presence at the scene and his flight therefrom was insufficient to support the theft conviction. *Id.* at 349-50.

In *Commonwealth v. Johnson*, 415 A.2d 1246 (Pa. Super. 1979), police observed two brothers standing in front of a store entrance at 11:15 p.m. *Johnson*, 415 A.2d at 1247. One brother was facing the door while the other brother, the appellant, looked toward the street. *Id.* As the police approached the two brothers, they began to walk away. *Id.* The police then noticed a screwdriver wedged into the door jam and immediately arrested the brothers. *Id.* "Further investigation revealed fresh jimmy marks around the door jam." *Id.* Subsequently, following a bench trial, the appellant was convicted of, *inter alia*, attempted burglary based on the foregoing facts. *Id.* On appeal, however, we determined that the evidence was insufficient to support the conviction. In so doing, we explained:

> There was no direct evidence that either man had committed a criminal act. The police did not see appellant touch the door, use the screwdriver, or perform any motions indicating usage. No fingerprints were found at the scene. Neither man was carrying burglary tools. Although guilt can be proved entirely by circumstantial evidence, the only circumstances here were presence at the scene of an attempted crime during late night hours and flight following arrival of the police.

*Id.* (citation omitted).

Our review of the record here reveals that, unlike in *Goodman*, *Keller*, and *Johnson*, Appellant's conviction for theft by unlawful taking of

firearms was not anchored solely in the fact that he was merely present and, subsequently, left the scene of the incident.  As the trial court found:

> Appellant and [Mideaugh] had been hired off of Craigslist by a moving company to help move [Lombardo] into the new house. Appellant gave [Lombardo] and [Demanche] a fake name, "Michael."  Appellant and [Mideaugh] were often moving items into the basement of the new house.  [Lombardo] became nervous about the conduct of Appellant, and testified that whenever he would enter the basement Appellant would become quiet and would suddenly run back upstairs.  Due to his suspicions about Appellant, [Lombardo] began to keep an eye on [Appellant].  While [Lombardo] was looking around the new house, he noticed that his gun case was open and three handguns were missing.
>
> [Lombardo] then approached Appellant, [Demanche], and the other men working to unload the moving truck and informed them that he was missing personal items from inside the new house.  [Lombardo] testified that following these remarks, Appellant "put his head down," "turned his back, put his hands in his pocket, got his keys out, and headed for his car." [Lombardo] tried to prevent Appellant from leaving, but was unsuccessful and Appellant "sped out and took off."  [Lombardo] then called 911 to report the situation as it unfolded. . . .
>
> Moreover, in Appellant's case, [Demanche] testified that after a few hours of work Appellant started to get "really antsy and wanted to leave. . .," and that Appellant's demeanor seemed to change.  Appellant walked to this car on three separate occasions to get gum or cigarettes, and was "[m]essing with stuff in his car."  [Demanche] further testified that Appellant did not ask to be paid for the work he performed before he left in a "real hurry," and has never requested to be paid since in the incident.

Trial Court Opinion, 1/26/15, at 3-4 (record citation omitted).  The trial court's foregoing findings emphasize that Appellant here was more than simply present at the scene.  He was hired to help Lombardo move into the new residence.  While at the residence, Appellant frequently had been going to the basement where the handguns were stored.  Appellant's behavior at the residence was described as antsy.  When approached about the missing

items, Appellant left in a real hurry without getting paid for the work he had performed. Thus, contrary to **Goodman**, **Keller**, and **Johnson**, in the instant case, after reviewing the evidence presented, cast in the light most favorable to the Commonwealth as verdict winner, we find the evidence indeed is sufficient to warrant the jury's conviction for theft by unlawful taking of firearms.

We next consider Appellant's argument that the trial court erred in denying his motion for a mistrial based on the hearsay statements made by Demanche in the presence of the jury. We, however, need not address Appellant's second argument, because he has failed to preserve it for appeal. **See** Pa.R.A.P. 302(a).

As we explained in **Commonwealth v. Szakal**, 50 A.3d 210 (Pa. Super. 2012):

> [T]he decision to declare a mistrial is within the sound discretion of the trial court and will not be reversed absent a flagrant abuse of discretion. A mistrial is an extreme remedy that must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial.

**Id.** at 218 (citation and quotation marks omitted). Under Pennsylvania Rule of Criminal Procedure 605, relating to mistrials, "[w]hen an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion **shall be made when the event is disclosed**. Otherwise, the trial judge may declare a mistrial only for reasons of manifest necessity." Pa.R.Crim.P. 605(B) (emphasis added); **see also Szakal**, 50

A.3d at 219 (noting that the appellant's claim was waived because the appellant waited a substantial period before moving for mistrial).

Instantly, as noted above, Appellant failed to timely move for a mistrial based on Demanche's statements about Appellant being told to return the missing guns to Lombardo. In other words, Appellant waited a substantial period before requesting mistrial. As the trial transcript reflects, Appellant moved for mistrial well **after** Demanche had presented his testimony. Thus, because Appellant did not timely move for a mistrial, we reject his second argument as waived.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/28/2015