**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Joyce Lillian NEWTON, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 22, 2010.

Filed April 30, 2010.

John D. Broda, Sunbury, for appellant.

John P. Muncer, Assistant District Attorney, Sunbury, for Com., appellee.

BEFORE: ALLEN, LAZARUS and OLSON, JJ.

OPINION BY OLSON, J.:

¶ 1 Appellant, Joyce Lillian Newton, appeals from the judgment of sentence entered on April 13, 2009. We affirm in part and vacate in part.

¶ 2 The Commonwealth charged Appellant with criminal use of a computer, conspiracy to commit criminal use of a computer, conspiracy to commit access device fraud, conspiracy to commit theft by deception, receiving stolen property, conspiracy to commit receiving stolen property, identity theft, and conspiracy to commit identity theft. The charges arose out of Appellant's participation in a scheme in early 2004 to ship laptop computers, purchased with a stolen credit card, to South Africa.

¶ 3 A jury trial took place on January 16, 2009.[1] The first witness to testify was

1. We recognize the lengthy delay between the alleged offenses and the time of trial. Appellant was originally accepted to the Accelerated Rehabilitative Disposition (ARD) program.

Edmund Rice, vice president of sales for Advantec Computer Systems, a computer wholesaler based in Marlborough, Massachusetts. In early 2004, an individual using the name "Benny Roberts" filed an online application to become a customer of Advantec. N.T., 1/16/09, at 14. "Benny Roberts" indicated that he was a reseller. *Id.* at 15. The individual provided the name and credit card number of both Benny Roberts and his wife, Linda Roberts. *Id.* at 26. All contacts between Advantec and "Benny Roberts" were by email, not in person. *Id.* at 16.

¶ 4 Initially, "Benny Roberts" purchased computers and had them shipped to an address in New Jersey. *Id.* at 15. Eventually, however, "Benny Roberts" indicated to Advantec that he wanted the computers shipped to a "branch location" in Sunbury, Pennsylvania. *Id.* at 15, 32. Specifically, Advantec was told to ship them to "Bruton Cole" at 209 Ridge Avenue, Sunbury. *Id.* at 22; Commonwealth's Exhibit 5.[2] Advantec shipped five computers to the Sunbury location. *Id.* at 18–19, 31.

¶ 5 Eventually, Advantec began receiving "charge back" notices, indicating that the credit card holder did not authorize the transaction. *Id.* At that point, Mr. Rice contacted Detective Christopher Blase of the Sunbury Police Department. Detective Blase learned that "Benny Roberts" had ordered a sixth computer to be shipped to the Sunbury address. Detective Blase directed Advantec to ship that computer to Sunbury, where it would be tracked and intercepted. *Id.* at 19–20.

¶ 6 On cross-examination, Mr. Rice indicated that he did not know who opened the "Benny Roberts" account, who directed the shipments, or who initiated the email contact. *Id.* at 25–27, 37. He further testified that Appellant did not set up the account with Advantec. *Id.* at 27. Mr. Rice did not know who used Mr. Roberts' name and credit card numbers to complete the transactions. *Id.* at 32.

¶ 7 Detective Blase testified that he executed a search warrant at the Sunbury address at 11:30 a.m. on March 5, 2004. When he arrived at the premises, he saw two packages on the porch that were set to be shipped to "Wanda Delpu" in South Africa. *Id.* at 41. Appellant answered the door, waived her *Miranda* rights, and spoke to the detective. She told him "that she was the only one who lived there, that nobody by the name of Bruton Cole, whose name was on the package, lived at that residence." *Id.* at 44. According to Detective Blase, Appellant used the name "Bruton Cole" as the shipper for outbound packages to South Africa; she also signed that name on the "sender's signature" line. *Id.* at 45.[3]

¶ 8 When Detective Blase asked Appellant about the shipments, she told him that her boyfriend, Omega, from South Africa

Appellant filed an appeal relating to the amount of restitution imposed through the program. After this Court quashed that appeal, Appellant's ARD status was revoked and the case was re-listed for trial. The parties began pretrial proceedings in the spring of 2008.

2. According to Mr. Rice, it is commonplace for someone to order computers and then have them shipped to a different individual. *Id.* at 34.

3. While the parties and counsel at trial used the names "Bruton Cole" and "Wanda Delpu," our review of the shipping records indicates that Appellant used the name "Brunton Cole" as the shipper and "Wanda Dlepu" as the recipient in South Africa. Commonwealth's Exhibit 8. Thus, while Appellant received packages in the name of "Bruton Cole," she re-shipped them under the name of "Brunton Cole." Compare Commonwealth's Exhibits 5, 8.

had shipped the computers to her, along with gifts such as jewelry, shoes, and small appliances (again, all under fake names). *Id.* at 49. Appellant said that she was "instructed" to re-ship those items to South Africa. *Id.* at 49, 53. Occasionally, Appellant could keep some of the packages such as the small appliances. According to Detective Blase, Omega had also used a fraudulent credit card to pay for Appellant's internet access. *Id.* at 49. Appellant did not have an explanation for why she was shipping the packages in a name that was not hers. *Id.* at 49–50, 55. The police searched Appellant's house, and they confiscated various papers and magazines mailed to Appellant's address with the recipient names of Bruton Cole or Jepson Hughes. *Id.* at 45. Appellant stated that she did not know anyone by the name of Bruton Cole or Jepson Hughes, and that neither person lived at her residence. *Id.* at 50. Upon police questioning, Appellant could not explain why she was getting catalogs and items in the mail under the names of Bruton Cole and Jepson Hughes. *Id.* at 50. She also stated that she was expecting to receive 30 more computers from Omega within the next few days to be reshipped. *Id.* at 50.

¶ 9 On cross-examination, Appellant's counsel asked Detective Blase if he attempted to determine if Bruton Cole was a real individual. He responded that he checked Department of Motor Vehicle records, and found no one in Pennsylvania with a driver's license under that name. *Id.* at 52.

¶ 10 Appellant testified in her own defense. She stated that she met Omega through an internet dating service, and that eventually she hoped to marry him. *Id.* at 58–59.[4] After months of contact, he started sending laptops to her house, and asked her to re-ship them. *Id.* at 60. She did so because he told her that he had a computer company; she did not know that anything fraudulent was going on. *Id.* at 60–61. He told her that the items could not be shipped directly to South Africa from the computer company because "a lot of companies don't ship internationally, and I believed him." *Id.* at 63. She did not know Benny Roberts or have anything to do with using his credit card information; in fact, she does not have a credit card herself. *Id.* at 61. Omega never told her how the computers were purchased. *Id.* at 62.

¶ 11 Appellant was acquitted of most of the charges, but was convicted of receiving stolen property, identity theft, and conspiracy to commit identity theft. On April 13, 2009, Appellant was sentenced to an aggregate probation term of six years, plus restitution, fines, and costs.[5] On April 16, 2009, Appellant filed timely post-sentence motions; they were denied on June 30, 2009. This timely appeal followed.

¶ 12 Appellant raises two issues on appeal:

1. Was the evidence and testimony introduced at trial insufficient to support the defendant's conviction for receiving stolen property, identity theft and criminal conspiracy identity theft?

---

4. She further testified that she was living on disability, was a born-again Christian, and had been "alone" for 10 years, and had a low IQ. Omega had promised her "the world," and told her that he would love her and treat her right. She had hoped for a "godly, Christian life" in marriage with him. *Id.* at 64–65, 69. She is 57 years old, previously married, with three adult children (now 36, 34, and 26)

that she raised "basically by myself." *Id.* at 70.

5. The court imposed two years of probation for each count, with all to run consecutively. The court imposed restitution on the receiving stolen property charge, but not the other two charges.

2. Did the trial court err when it included the name of Bruton Cole in the jury instructions that it read to the jury for the charges of identity theft and criminal conspiracy identity theft because there was insufficient evidence offered at trial that the name was that of an actual person?

Appellant's Brief at 6.[6]

■ ¶ 13 First, Appellant argues that the evidence was insufficient to support the conviction for receiving stolen property.

Our standard of review in a sufficiency of the evidence challenge is to determine if the Commonwealth established beyond a reasonable doubt each of the elements of the offense, considering all the evidence admitted at trial, and drawing all reasonable inferences therefrom in favor of the Commonwealth as the verdict-winner. The trier of fact bears the responsibility of assessing the credibility of the witnesses and weighing the evidence presented. In doing so, the trier of fact is free to believe all, part, or none of the evidence.

*Commonwealth v. Pruitt,* 597 Pa. 307, 951 A.2d 307, 313 (2008) (citations omitted), *cert. denied,* —— U.S. ——, 129 S.Ct. 1614, 173 L.Ed.2d 1001 (2009).

¶ 14 "Receiving stolen property is established by proving that the accused 'intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed of with intent to restore it to the owner.' 18 Pa.C.S.A. § 3925(a)." *Commonwealth v. Galvin,* 985 A.2d 783, 792 (Pa.2009).

■ ¶ 15 Importantly, the Legislature expressly defined the required mental state as "knowing" or "believing." Because the Legislature excluded mental states such as recklessness, negligence, or naïveté about the stolen status of the property, those mental states are insufficient. *Commonwealth v. Dunlap,* 351 Pa.Super. 43, 505 A.2d 255, 257 (1985); *see also Commonwealth v. Ostrosky,* 589 Pa. 437, 909 A.2d 1224, 1230 n. 7 (2006) (express inclusion of certain statutory terms implies the exclusion of those that are not mentioned); *compare* 18 Pa.C.S.A. § 302(c) (where the Legislature does not define the relevant mental state, a finding of recklessness is sufficient). This reasoning is consistent with the common recognition that penal statutes are to be strictly construed. *Commonwealth v. Jarowecki,* 985 A.2d 955, 959 (Pa.2009), *citing* 1 Pa.C.S.A. § 1928(b)(1). Thus, courts may not hold that a less-culpable mental state satisfies a criminal statute where the statute demands proof of the more culpable mental state. *See Dunlap; compare* 18 Pa.C.S.A. 302(d) (generally, if the Commonwealth proves a more culpable mental state, then the less culpable mental state is satisfied).

¶ 16 Indeed, we note that when the Legislature adopted the current version of § 3925 in 1972, it changed the requisite mental state from "knowing, or having reasonable cause to know the same to have been stolen" to the current definition. 18 Pa.C.S.A. § 3925, official comment. We interpret this change as eliminating any suggestion that a person can be found guilty of receiving stolen property simply by retaining property that a reasonable

---

**6.** We have reordered Appellant's issues for ease of disposition. On July 29, 2009, the trial court directed Appellant to file a concise statement of errors complained of on appeal under Pa.R.A.P. 1925. Appellant filed a time-ly concise statement, raising the same issues that are raised in this appeal. The trial court issued a Rule 1925 opinion on October 23, 2009.

person would conclude is probably stolen. Under the new formulation, the defendant must, at a minimum, harbor the personal belief that the item is probably stolen.[7] That distinction between negligence or recklessness and true guilty knowledge is at the heart of the instant case.

¶ 17 Guilty knowledge (like all culpable mental states) may be proved by circumstantial evidence. *See Pruitt*, 951 A.2d at 314. "Often, intent cannot be proven directly but must be inferred from examination of the facts and circumstances of the case." *Commonwealth v. Pond*, 846 A.2d 699, 707 (Pa.Super.2004) (citation omitted). "When examining the totality of the circumstances to determine if there is sufficient evidence from which a jury could infer the requisite *mens rea*, we must, as with any sufficiency analysis, examine all record evidence and all reasonable inferences therefrom." *Id.* (citation and internal quotation marks omitted). In conducting our assessment, we stress again that we must view the evidence in the light most favorable to the Commonwealth as the verdict winner. *Pruitt*, 951 A.2d at 313. The trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence. *Commonwealth v. Watkins*, 577 Pa. 194, 843 A.2d 1203, 1211 (2003).

¶ 18 Here, it is undisputed that Appellant intentionally received, briefly retained, and then disposed of stolen property. The question is whether the Commonwealth established that Appellant knew the property was stolen, or believed that it had probably been stolen. A person "knows" that goods are stolen if he is "aware" of that fact. *See* 18 Pa.C.S.A. § 302(b)(2)(i). Here, there is no evidence in the record to support a finding beyond a reasonable doubt that Appellant was affirmatively aware of the fact that the computers were stolen. Thus, we must determine if the Commonwealth proved that Appellant "believed" the computers were "probably" stolen.

¶ 19 The Crimes Code does not further explain this phrase. However, it is clear that it is designed to criminalize situations where the defendant does not know for certain that the goods are stolen, but nevertheless has: (1) considered the possibility that the goods are stolen and (2) concluded that the answer is at the very least, "probably." This Court has determined that such a belief can be proven by any number of circumstantial factors:

> In order to establish the *mens rea* element of the crime of receiving stolen property, the Commonwealth must prove that the accused possessed property with "guilty knowledge", *i.e.*, know-

---

7. In *Commonwealth v. Matthews*, 429 Pa.Super. 291, 632 A.2d 570, 572 (1993), a three-judge panel of this Court wrote that "[i]n order to obtain a conviction for receiving stolen property, the Commonwealth must prove beyond a reasonable doubt that the property was stolen, the defendant was in possession of the property and the defendant knew the property was stolen or had reason to believe the property was stolen." For that proposition, the *Matthews* Court cited our *en banc* opinion in *Commonwealth v. Stafford*, 424 Pa.Super. 591, 623 A.2d 838 (1993)(*en banc*), *affirmed*, 539 Pa. 278, 652 A.2d 297 (1995). *Stafford*, in fact, correctly states that

under the 1972 Model Penal Code amendment to § 3925, "It is not enough that the Commonwealth proves only that: 1) The defendant received property of another; and 2) He received the property knowing it was stolen or believing it had probably been stolen. The Commonwealth also must establish that the property was actually stolen." *Id.* at 840. In our view, the phrasing in *Stafford* is clearly correct. To the extent that the phrase "reason to believe the property was stolen" is used in our case law, we must interpret that phrase as being equivalent to the express statutory language "believing it had probably been stolen."

ing that it has been stolen, or believing that it has probably been stolen.

The necessary knowledge [ . . . [8]] may be demonstrated by circumstantial evidence, and an inference of guilty knowledge may be drawn from unexplained possession of recently stolen goods. Whether possession is recent and whether it is unexplained are normally questions of fact for the trier of fact. *Commonwealth v. Williams,* 468 Pa. 357, 362 A.2d 244 (1976).

[O]ther circumstances involved in any given case may also be considered by the trier of fact in determining if the inference [of guilty knowledge] may properly be drawn from the unexplained possession. Amongst such circumstances are the accused's conduct at arrest and his conduct while in possession of the goods, as well as, the accused's relationship, if any, with the victim of the theft. Once the inference is properly drawn by the trier of fact and pursuant to the understanding that it cannot be drawn unless he is convinced that the unexplained possession is so recent as to convince him of the inferred fact beyond a reasonable doubt and his conviction of the same is not weakened below this standard by other circumstances, an appellate court may not reverse unless, after considering the evidence, it believes a juror or judge, acting in a reasonable and rational manner, could not have been convinced beyond a reasonable doubt.

*Dunlap,* 505 A.2d at 257. In *Dunlap,* this Court reversed a conviction for receiving stolen property where the defendant was spotted on the street in recent possession of a stolen automobile. After the defendant walked away from the vehicle, the police approached it. The defendant returned to the vehicle and asked the officers "what was the matter." *Id.* at 256. After admitting that he drove the stolen car, he was arrested. This Court reversed the judgment of sentence, even though he was in recent and unexplained possession of stolen goods, because the surrounding circumstances did not demonstrate that the defendant had the requisite *mens rea.* Specifically, the vehicle showed no outward signs of being stolen, and his behavior toward the officers showed no sign of guilty knowledge.

¶ 20 Likewise, in *Matthews,* this Court reversed a conviction for receiving stolen property where the defendant was found driving a stolen car. The defendant told police, and testified at trial, that he rented the vehicle from a third party in exchange for two rocks of crack cocaine worth $35.00. The Commonwealth did not contradict this testimony. Moreover, the defendant appeared surprised when he was arrested, and nothing about the physical condition of the vehicle indicated that it was stolen. *Id.* at 572–573 (citing numerous cases with similar fact patterns).

¶ 21 On the other hand, in *Commonwealth v. Grekis,* 411 Pa.Super. 494, 601 A.2d 1275 (1992), this Court held that a convenience store owner/operator had requisite guilty knowledge that he was selling stolen cigarettes, despite his protestations to the contrary, where a relative/store employee purchased massive numbers of stolen cigarette cartons from a burglar, the cartons were kept in and sold from the store, the store had no documentation for the legitimate receipt of those cartons, and

---

8. Our ellipses omit the words "or recklessness." This is so because the defendant in *Dunlap* was also charged with unauthorized use of an automobile, a crime for which recklessness will suffice. *Id.* at 257.

tax stamps on the cartons showed 65 different sources but the store lawfully purchased cigarettes from only two sources.

¶ 22 This instant case is more of a close call than *Grekis*. However, in considering the evidence in the light most favorable to the Commonwealth, and in due deference to the factual findings and credibility determinations of the jury, we conclude that the Commonwealth did present sufficient evidence to support a conviction for receiving stolen property. We recognize that the Commonwealth presented no evidence that Appellant had any knowledge of how the computers were initially procured. So far as we can discern from the record, nothing about the physical characteristics of the computers indicated that they were stolen. They were shipped to Appellant's home from a legitimate computer supplier and Appellant (a woman with a lower IQ) testified that she believed her boyfriend when he told that that a lot of companies do not ship items internationally. As in *Dunlap* and *Matthews*, even after Appellant was confronted by police on her front porch, she demonstrated no overt guilty knowledge.

¶ 23 Nevertheless, during the prolonged scheme, Appellant utilized the fictitious name of Bruton (or Brunton) Cole to both receive and send the computers, even going so far as to sign "Brunton Cole", and not her real name, on the shipping slips. These acts of concealment are a strong indicator that Appellant possessed the computers with the belief that they were probably stolen.[9] A jury could reasonably infer that Appellant assumed the fake mailing identity of Bruton Cole for the purpose of distributing stolen computers on behalf of Omega. Such an inference is buttressed by the fact that Omega sent Appellant other items in the mail, such as jewelry and small appliances. As with the computers, Appellant received and reshipped these items to South Africa using a fictitious name. Finally, Omega permitted Appellant to keep some of the smaller items, and he paid for her internet access. A reasonable jury could view this as the means by which Omega paid Appellant consideration for her services in aiding him in his scheme. Moreover, the jury was free to disregard Appellant's exculpatory testimony as unworthy of credence. *See Commonwealth v. Ratsamy*, 594 Pa. 176, 934 A.2d 1233, 1237 (2007). On this record, we cannot conclude that the evidence was so weak and inconclusive that, as a matter of law, the jury was precluded from finding that Appellant possessed the belief that the computers were probably stolen. *See id.* While this is a close case, our standard of review and deference to the jury's factual findings compels the result. Appellant's first claim lacks merit.

¶ 24 We now turn to the sufficiency of the evidence supporting Appellant's convictions for identity theft.[10] The Crimes Code defines identity theft as follows:

§ 4120. Identity theft

(a) Offense defined. A person commits the offense of identity theft if he possesses or uses, through any means, identifying information of an-

---

9. She also received catalogs and mail under names that were not her own, all with no explanation.

10. Identity theft is contained in Chapter 41 of the Crimes Code ("Forgery and Fraudulent Practices") rather than Chapter 39 ("Theft and Related Offenses"). This may be the case because despite the name of the crime, the Commonwealth need not prove that the victim's identifying information was actually "stolen." Rather, it is a crime simply to possess or use the identifying information of another for an unlawful purpose, regardless of whether that information had been "stolen." 18 Pa.C.S.A. § 4120(a).

other person without the consent of that person to further any unlawful purpose.

. . .

(f) ["Identifying information" means] any document, photographic, pictorial, or computer image of another person, or any fact used to establish identity, including, but not limited to, a name, birth date, Social Security number, driver's license number, nondriver governmental identification number, telephone number, checking account number, savings account number, student identification number, employee or payroll number or electronic signature.

18 Pa.C.S.A. § 4120(a), (f) (emphasis added).

¶ 25 Here, the trial court instructed the jury that it could find Appellant guilty of identity theft if it found that she used the identifying information of Linda Roberts, Benny Roberts, and/or Bruton Cole. N.T., 1/16/09, at 88, 103.[11] The jury verdict slip did not ask the jury to specify the individual(s) who were the victims of the identity theft. Thus, it is unclear at best who the alleged victims were.

¶ 26 In the instant case, there is no evidence that Appellant possessed or used for any purpose the identifying information of Benny Roberts or Linda Roberts. Specifically, the record contains no evidence that Appellant stole the Roberts' credit cards, used their names or informa-tion to obtain the computers, or in any other way participated in the theft or use of the Roberts' information.

¶ 27 At most, the evidence established that Appellant used the name of Bruton (and/or "Brunton") Cole[12] to receive computers from Advantec and ship them overseas. The question then becomes whether the Commonwealth must establish that the name "Bruton Cole" is the identity of a real person. We readily hold that this is a requirement. The Statutory Construction Act defines a "person" as:

"PERSON." Includes [sic] a corporation, partnership, limited liability company, business trust, other association, government entity (other than the Commonwealth), estate, trust, foundation or natural person.

1 Pa.C.S.A. § 1991. More to the point, "[a] person is defined as a living human being, especially as distinguished from an animal or a thing." *Commonwealth v. Lawson*, 759 A.2d 1, 4 (Pa.Super.2000).[13] Moreover, a plain reading of the statute indicates that it is designed to prohibit the malicious use of identifying information such as actual names, account numbers, identification numbers, and the like.

■ ¶ 28 Here, the Commonwealth presented no evidence whatsoever indicating that Bruton Cole was a living human being (or other "person" as defined by the Act and case law). It appears from the record

---

11. Appellant was first charged only with identity theft with respect to Bruton Cole. Docket Entry 1. At trial, counsel did not object to the inclusion of Linda Roberts and Benny Roberts, who are real persons. Counsel did, however, object to the inclusion of Bruton Cole, presumably because there was no evidence that this was an actual person. *Id.* at 106.

12. *See* footnote 3.

13. In *Commonwealth v. Booth*, 564 Pa. 228, 766 A.2d 843 (2001), our Supreme Court considered the question of whether an unborn child was a "person" for purposes of the crime of homicide by vehicle while driving under the influence. That complex discussion has little immediate bearing on our analysis, but the *Booth* Court emphasized again that ambiguities in penal statutes should be construed in the light most favorable to the defendant. *Id.* at 846.

that Bruton Cole was merely a fictitious name, not a specific person with real identifying information.[14] Because the Commonwealth had the burden to prove every element of the crime beyond a reasonable doubt, and failed to do so, we vacate the conviction and judgment of sentence for identity theft.

¶ 29 Finally, we turn to the sufficiency of the evidence for conspiracy to commit identity theft. The law of conspiracy is well settled:

> To sustain a criminal conspiracy conviction, the Commonwealth must establish a defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, with a shared criminal intent, and an overt act was done in the conspiracy's furtherance. 18 Pa.C.S. § 903; *Commonwealth v. Rios*, 546 Pa. 271, 684 A.2d 1025, 1030 (Pa.1996) (citations omitted). The overt act need not accomplish the crime—it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed.
>
> Footnote: Section 903 provides, in relevant part:
>
> (a) Definition of conspiracy.—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which con-

stitutes such crime or an attempt or solicitation to commit such crime; or (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

*Commonwealth v. Weimer*, 602 Pa. 33, 977 A.2d 1103, 1105–1106 & n. 2 (2009) (emphasis added). In the instant case, because the use of the name "Bruton Cole" does not constitute identity theft, it logically follows that Appellant could not be convicted of conspiring to commit identity theft regarding Bruton Cole. Thus, we turn to the question of whether Appellant conspired to commit the identity theft of Benny Roberts or Linda Roberts. Again, the record does not support such a finding. First, we will assume *arguendo* that "Omega" stole the identity of those individuals. Next, we recognize that Appellant entered into an agreement with Omega to ship computers using stolen credit card information. Those shipments to Sunbury and overseas took place after Omega used the Roberts' identifying information. The record reflects no evidence that Appellant had any awareness of the identity theft, let alone a shared intent to facilitate that crime. Accordingly, we vacate the judgment of sentence for conspiracy to commit identity theft.

¶ 30 Judgment of sentence affirmed as to receiving stolen property. Conviction and judgment of sentence vacated as to identity theft and conspiracy to commit identity theft. Remanded for resentencing consistent with this Opinion. Jurisdiction relinquished.[15]

---

**14.** Prohibitions against the use of a false name appear in other contexts. *See, e.g.,* 54 Pa.C.S. § 701 (Change of Name statute); *Commonwealth v. Goodman*, 544 Pa. 339, 676 A.2d 234 (1996). We decline to delve into the question of whether Appellant's conduct was criminal under other statutes with which she was not charged or convicted. We need only conclude that her conduct did not constitute identity theft. We also note that the harm caused by stealing or using another person's

identity is considerably different from the harm caused by using a fictitious name.

15. As a result of our disposition, we need not consider Appellant's second issue on appeal.