J-S31021-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CODY ALLEN NETHKEN | : | |
| | : | |
| Appellant | : | No. 1211 WDA 2016 |

Appeal from the Judgment of Sentence January 26, 2016
In the Court of Common Pleas of Washington County
Criminal Division at No(s): CP-63-CR-0002118-2014

BEFORE: PANELLA, J., DUBOW, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY DUBOW, J.:                    **FILED JUNE 9, 2017**

Appellant Cody Allen Nethken appeals from the Judgment of Sentence imposed after a jury convicted him of Theft by Unlawful Taking and Receiving Stolen Property.[1]  Appellant challenges the weight and sufficiency of the evidence.  We affirm.

We glean the following salient facts from the certified record.  Between May and July 2014, Appellant and four other individuals, hired by Arthur Spitznogle of All Seasons Builders, LLC. ("All Seasons"), worked on a residential remodeling project at the home of Kenneth and Leisa Conklin in Vestaburg, a town near the West Virginia/Pennsylvania border.  Appellant's work involved removing and installing windows on the second floor of the

_____

[1] 18 Pa.C.S. §3921(a) and 18 Pa.C.S. §3925(a), respectively.

home, and assisting in general carpentry work as needed inside and outside the house.

On July 18, 2014, after the crew had left for the day, Mr. Conklin was preparing to spend the weekend shooting with his son when he noticed that a .40 caliber Glock handgun and ammunition that he kept in the master bedroom were missing. He also discovered that two other handguns, a .22 caliber Taurus and a .45 caliber Springfield, along with two holsters, three magazines, ammunition, and approximately $300 in cash, were missing from a duffle bag in his son's bedroom.[2] The Conklins called both the East Bethlehem Police Department and Mr. Spitznogle to report the missing items, and to request that the crew meet at the house the next day before heading over to the police station for interviews.

On July 19, 2014, when the crew arrived, Mr. Conklin privately told Mr. Spitznogle that if the guns were returned, "this will all go away." Trial Ct. Op., dated 8/10/16, at 3, citing Notes of Testimony ("N.T."). Mr. Spitznogle relayed the message to the crew, but no one came forward to admit to taking or receiving the firearms. Police investigators then questioned the crewmen individually at police headquarters. Appellant did not show up to work after the July 19th police interview.

_____

[2] The duffle bag also contained, *inter alia*, a knife that was not stolen. DNA and fingerprint analysis on the items that remained in the bag from which the guns had been stolen was inconclusive.

The Conklins posted reward fliers around the area seeking information about their guns. They stopped in at the Granville Police Department, located in the Morgantown, West Virginia area, and Officer Groves discovered on the statewide database that Appellant had pawned two of the three missing guns.

On August 8, 2014, the Commonwealth charged Appellant with 16 offenses, including theft by unlawful taking and receiving stolen property. Appellant waived his preliminary hearing, but at that proceeding told Chief Pompe, without giving him any details, that he had purchased the guns from William Wachner, the crew's foreman.[3]

A jury trial proceeded. The Commonwealth presented evidence showing that Appellant took the Taurus and Springfield handguns to two pawn shops in West Virginia: he sold the Taurus handgun for $100 at WV Jewelry and Loan, LLC, in Westover on June 30, 2014; and signed a pawn contract with Cashland Pawn III in Morgantown for the Springfield handgun on July 3, 2014. N.T., 10/21/15, at 359, 363, 370—71, 377, 381.

Appellant testified that he did not steal the guns from the Conklin house. He stated that sometime between June 11, 2014, and June 15,

_____

[3] The Commonwealth also charged the crew's foreman, William Wachner, in connection with the thefts on August 27, 2014. Wachner continued to work for All Seasons. The court dismissed the charges against Wachner at his preliminary hearing on September 8, 2014, because Appellant did not appear at the scheduled hearing time.

2014, Wachner came to his house, and Appellant purchased the Springfield and Taurus handguns from him, and then sold one and pawned the other to pay his rent. *Id*. at 508-16, 547-48. He stated that he later retrieved the Springfield handgun from the pawnshop.

Mr. Spitznogle testified that in June 2014, he and Appellant had installed windows in every room in the house, including the master bedroom and the bedroom of the Conklins' son. *Id*. at 319-20. He further testified that "[t]here was a few times I'd show up, you know, because I wasn't on the site all the time. … I would pull in, and [Wachner] would be … hollering for [Appellant] a couple times, and he'd be sitting down around back of the house, resting, or sometimes he'd be in the bathroom[.] I thought he had a bowel problem, you know." *Id*. at 322-23. Mr. Spitznogle further testified that on July 18, 2014, Appellant was working outside on the front siding with Wachner, and Spitznogle had noticed that Appellant ran to the bathroom in the house four to six times that day. He also stated that he saw Wachner frequently calling for Appellant when he was supposed to be helping him on the ground, but Appellant would not be there. *See id*. at 320-26. Mr. Spitznogle also testified that he had told the police that "the only one I can think of that would even consider doing something like this would be [Appellant because] he was always gone." *Id*. at 340. Mr. Spitznogle also testified that Wachner only worked inside the house on the first floor and was otherwise in the house only for lunch. *Id*. at 337.

- 4 -

Wachner testified, *inter alia*, that the crewmen would drive to his house every morning and he would drive them all in his van to the job site. N.T., 10/21/15, at 251-52. He further testified that he had never been to Appellant's home. *Id*. at 253. He stated that on July 18, 2014, he and Appellant worked together on the Conklin's front siding, with Wachner on the ladder and Appellant on the ground cutting pieces to hand up to him. Wachner stated that there were many times when he would call for Appellant from the roof and Appellant would not be at his cutting post. Wachner also testified that he had had nothing to do with the missing guns, and was extremely distraught when he learned about Appellant's accusation.[4] *Id*. at 275-76.

Mr. Conklin testified regarding the discovery of the missing firearms and his interactions with the Granville Police Department. **See** N.T., 10/20/15, at 103-07. He also testified that Appellant began working on the remodeling job with All Seasons in May and had helped install the windows in the bedrooms. *Id*. at 68, 125-29. He stated that Appellant would frequently ask to use the bathroom upstairs, while the other crew members were outside after lunch on a break, and he had observed others frequently being unable to locate Appellant for assistance. Mr. Conklin also stated that

_____

[4] Wachner also testified that, contrary to Appellant's accusation, he had not needed money for any medications and if he had, he would have asked his mother because she is a millionaire.

- 5 -

the box from which the ammunition had been stolen was normally kept in his son's room, but he found the empty box misplaced on a shelf in the furnace room located in the basement.

Mrs. Conklin testified that she would see Appellant in areas around the house where he was not needed. She encountered him once in her son's room when he was not working in there, and once in the furnace room in the basement of her house where there was no work to be done. *Id*. at 169-71. She also testified that the crewmen generally went to the bathroom behind the shed, while Appellant frequently used the only house bathroom which was upstairs. She further testified that on July 18, 2014, she heard other workers frequently calling out for Appellant because he was not where he was supposed to be. *Id*. at 171. She also stated that Appellant always wore cargo shorts that could easily conceal handguns, which she knew because her son wore similar shorts and had demonstrated how easily one could hide handguns and other items in the pockets. *Id*. at 173-74.

Chief Mark Pompe of the East Bethlehem Township police department testified regarding his interviews of the members of the All Seasons' crew conducted on July 19, 2014. He stated that when he asked Appellant about the guns, Appellant said he did not know anything about them. Chief Pompe also testified that after he learned that Appellant had pawned two of the guns in West Virginia, he arrested Appellant on August 8, 2014. He stated that on August 25, 2014, after Appellant waived his right to a preliminary

hearing, Appellant told him, in the presence of his lawyer, that he had bought the guns from Wachner for $250, but would not provide any further details, such as when, where and why. *Id*. at 412. Chief Pompe stated that Appellant told him that the Springfield handgun was hidden in a cooler in a shed located on his mother's property, but Appellant did not tell Chief Pompe anything about the location of the Taurus handgun. *Id*. at 415. Chief Pompe also testified that even though he had arrested Wachner and charged him based solely on Appellant's accusation, he never actually believed that Wachner had committed the crimes. *Id*. at 419.

The jury found Appellant guilty of two counts each of Theft by Unlawful Taking and Receiving Stolen Property. The court sentenced him to an aggregate of 12 to 24 months' incarceration, and later amended the sentence to add restitution.

After the denial of post-sentence motions, Appellant appealed. The trial court did not order Appellant to file a Pa.R.A.P. 1925(b) statement. The trial court submitted its August 10, 2016 Opinion denying Appellant's post-sentence motion as its Rule 1925(a) Opinion.

Appellant raises the following issues for our review:

> 1. Did the trial court err, as a matter of law, by denying [Appellant's] Motion for Judgment of Acquittal when the evidence presented at trial was insufficient to prove the Defendant committed the alleged crimes beyond a reasonable doubt?
>
> 2. Did the trial court err, as a matter of law, by denying [Appellant's] Motion for a New Trial when the weight o

- 7 -

the evidence presented at trial did not support the alleged crimes of the Defendant?

Appellant's Brief at 7.[5]

Appellant first challenges the sufficiency of the evidence, which we review pursuant to the following standard:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. **The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.** Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Baker*, 72 A.3d 652, 657–58 (Pa. Super. 2013) (citation omitted) (emphasis added).

A person is guilty of Theft by Unlawful Taking "if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S. § 3921(a). The crime of Receiving

---

[5] We note with disapproval that, despite having been granted two extensions of time to file an appellee's brief, the Commonwealth failed to do so.

Stolen Property occurs when a person "intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen." 18 Pa.C.S. § 3925(a). "Receiving" is defined as "acquiring possession, control or title[.]" 18 Pa.C.S. §3925(b).

> In order to establish the *mens rea* element of the crime of receiving stolen property, the Commonwealth must prove that the accused possessed property with 'guilty knowledge,' *i.e.*, knowing that it has been stolen or believing that it has probably been stolen.
>
> The necessary knowledge may be demonstrated by circumstantial evidence, and an inference of guilty knowledge may be drawn from unexplained possession of recently stolen goods. Whether possession is recent and whether it is unexplained are normally questions of fact for the trier of fact.
>
> Other circumstances involved in any given case may also be considered by the trier of fact in determining if the inference of guilty knowledge may properly be drawn from the unexplained possession. Amongst such circumstances are the accused's conduct at arrest and his conduct while in possession of the goods, as well as the accused's relationship, if any, with the victim of the theft. Once the inference is properly drawn by the trier of fact . . ., an appellate court may not reverse unless, after considering the evidence, it believes a juror or judge, acting in a reasonable and rational manner, could not have been convinced beyond a reasonable doubt.

*Commonwealth v. Newton*, 994 A.2d 1127, 1131-33 (Pa. Super. 2010) (citation omitted).

Appellant asserts that the Commonwealth "failed to prove beyond a reasonable doubt that [Appellant] was the one to 'take' the firearms from the Conklin's residence." Appellant's Brief at 13. He claims that "the testimony at trial . . . centered almost exclusively on the events of July 18,

2014[.] However, the guns were both removed from [the Conklins'] house prior to this date as evidenced by the pawn records submitted by the Commonwealth" showing transactions of June 30, 2014, and July 3, 2014. *Id*. at 13-14. Appellant also states that the testimony established that other workers on the premises had the same access as Appellant to the stolen items, but "there [was] virtually no testimony in regards to the whereabouts of the other individuals working at the Conklin's," and "the Commonwealth did not present any testimony on when the Taurus revolver and Springfield pistol were taken from the Conklin's house" *Id*. at 15.

Appellant's argument essentially relies on evidence that was **not** presented at trial to support his claim of insufficiency. Our review, however, focuses on the evidence that **was** admitted at trial, and "the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Baker*, *supra* at 658.

As noted in detail above, the evidence that was presented to the jury showed that Appellant worked in the Conklins' house doing various building jobs between May and July 2014; he had access to many parts of the house; he was found numerous times throughout his employment period alone in areas of the house in which he had no business being; he wore the same cargo shorts with large pockets to work each day; he failed to tell Chief Pompe at his interview on July 19, 2014 that he had pawned/sold the guns and, in fact, said he knew nothing about the guns; and he failed to show up

for work or even call Mr. Spitznogle after the July 19th interview at the police station. Further, it was only at the courthouse when he waived his preliminary hearing that Appellant changed his story and implicated Wachner as being the one who had taken the guns.

Appellant analogizes this case to **Commonwealth v. Stores**, 463 A.2d 1108 (Pa. Super. 1983), where this Court reversed a judgment of sentence after concluding that the inferences the jury drew were not reasonable where the only solid evidence presented by the Commonwealth to support its charge of Theft by Unlawful Taking was the presence of Appellant along with others in the jewelry shop on the day the jewelry disappeared. The instant case is distinguishable from **Stores**.

Here, there was extensive testimony from the victims and others not only about Appellant's presence in the house, but also specifically about Appellant's presence in areas of the house alone where he was not needed several times over the course of two months. In addition, there was evidence that Appellant consistently wore cargo pants with pockets big enough to hide handguns and other items; failed to show up to work after the police questioned him; failed to tell Chief Pompe about his pawning the guns in June and early July until after the officer received documents showing the transactions; and failed to provide detailed information to Chief Pompe to support his accusation that Wachner had sold him the guns. Moreover, the Commonwealth presented receipts and testimony from the

pawnshops containing Appellant's name as the seller/pawner. Thus, unlike **Stores**, there was plenty of other compelling circumstantial evidence besides Appellant's mere presence in the house from which the jury could reasonably infer that Appellant had taken the guns.

With respect to the convictions for Receiving Stolen Property, Appellant argues that the Commonwealth did not meet its burden of proving beyond a reasonable doubt that Appellant knew the guns were stolen because Chief Pompe "did not provide any specifics to the individual suspects when conducting his interviews on July 19, 2014." Appellant's Brief at 16. Appellant fails to acknowledge his conduct at his initial police interview, his failure to show up for work after his initial police interview, the circumstances of his subsequent arrest, his conduct while in possession of the goods, and his relationship to the victims of the theft. All of this evidence demonstrated Appellant's "guilty knowledge" and the jury properly considered it in determining whether the Commonwealth proved the requisite *mens rea* to support a conviction. **See Newton**, **supra** at 1131.

Our evaluation of the entire certified record confirms that the evidence is not "so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." **Baker**, **supra**. Viewing all the evidence admitted at trial in the light most favorable to the Commonwealth, there was sufficient evidence to enable the fact-finder to

find every element of the crimes beyond a reasonable doubt. Accordingly, Appellant's sufficiency challenge fails.

Appellant next purports to challenge the weight of the evidence. He avers that because his fingerprints are in a database from a prior conviction, the jury should have given more weight to Chief Pompe's testimony that "he couldn't get a hit on the print he retrieved from the knife" that was located in the bag from which the stolen items had been taken. Appellant's Brief at 17. He summarily concludes that the "conclusions reached by the jury, when viewed in total, shocks [*sic*] the conscience as the verdict is not wholly consistent with the evidence." *Id*.

Our standard of review for a challenge to the weight of the evidence is well settled. The finder of fact is the exclusive judge of the weight of the evidence and the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses. *See Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003). As an appellate court, we cannot substitute our judgment for that of the finder of fact. *See id.* Therefore, we will reverse a jury's verdict and grant a new trial only where the verdict is "so contrary to the evidence as to shock one's sense of justice." *See Commonwealth v. Passmore*, 857 A.2d 697, 708 (Pa. Super. 2004).

A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or

when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa. Super. 2004) (citation omitted).

Furthermore,

> where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Champney*, 832 A.2d at 408 (citation omitted).

"A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (citation omitted).

> Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*Id.* (internal citations, footnote, and quotation marks omitted).

Here, the trial court denied Appellant's post-sentence motion, thereby ruling on the weight of the evidence claim. With respect to Appellant's narrow argument regarding the fingerprint evidence, the trial court observed:

> The [c]ourt is unable to follow the Defendant's logic. Deductive reasoning does not conclude that the Defendant would only have stolen the handguns if there were a matching fingerprint on the knife. First, the Defendant may not have even seen or found the knife. Even if he had, the Defendant may not have been interested in owning or pawning the knife. The Defendant testified that he liked guns and that he had 13 in his collection. *Transcript of Proceedings, Volume II, at p. 514.* There was no such testimony regarding knives. Based upon this and the analysis above, this [c]ourt cannot conclude that the jury's verdict would shock the conscious.

Trial Ct. Op., at 8.

Bearing in mind our standard of review when evaluating a weight of the evidence claim, we find no palpable abuse of discretion in the trial court's denial of Appellant's motion. Further, we conclude that the jury's verdict does not "shock the conscience of the court." Appellant's weight challenge, thus, fails.

Judgment of Sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/9/2017

- 15 -