J-A06021-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.W., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.L.W. | : : : : : : : | |
| | : | No. 187 WDA 2020 |

Appeal from the Dispositional Order Entered August 23, 2019
In the Court of Common Pleas of Mercer County Criminal Division at
No(s):  CP-43-JV-0000074-2017

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED: APRIL 9, 2021**

J.L.W. appeals from the dispositional order, entered in the Court of Common Pleas of Mercer County, following his adjudication of delinquency for receiving stolen property (RSP),[1] a second-degree felony.  J.L.W. was placed on administrative supervision and ordered to pay court costs.  After careful review, we affirm.

On June 27, 2017, the Mercer County Juvenile Probation Office filed a delinquency petition against J.L.W.[2] alleging that on June 22, 2017, J.L.W. stole a firearm from Joseph Gaston, the father of one of J.L.W.'s life-long

_____

[1] 18 Pa.C.S. § 3925(a).

[2] J.L.W. was sixteen years old at the time of the alleged offense.  By the time of the disposition, he had already reached his eighteenth birthday.

friends, L.G. Gaston, a police officer, filed a report with the Sharon Police Department when he realized the gun was missing from his home safe.

Prior to hearings on the delinquency petition, J.L.W. filed an omnibus pre-trial motion to suppress statements he made while in custody.[3] At the suppression hearing,[4] Sharon Police Officer Ryan M. Chmura, a co-worker and personal friend of Gaston's, testified. Officer Chmura testified that on June 23, 2017, Gaston had called him and told him that "he had reason to believe that his stolen firearm" was at 185 Logan Avenue in the City of Sharon. N.T. Suppression/Adjudicatory Hearing, 7/22/19, at 11. Officer Chmura proceeded to the address armed and in full police uniform; when he arrived at the residence, he observed Gaston and J.L.W. on the porch of the abode. *Id.* at 11, 15. Patrolman Paul Lehman, also from the Sharon Police Department, was on the scene, armed and in uniform, and was "clearing the semiautomatic

---

[3] Several motions and petitions were submitted after the juvenile petition was filed and prior to the adjudication, resulting in more than a two-year delay before the dispositional order was entered against J.L.W. Those motions included: a motion to disqualify the district attorney and dismissal of the criminal information, a notice of insanity or mental infirmity defense, a motion for appointment of a special prosecutor, a petition for specialist fees, a motion to rescind referral to another district attorney, a motion to compel discovery, a motion to exclude expert report, and a motion *in limine*. Juvenile's Brief, at 7-11.

[4] At the beginning of the adjudicatory hearing, the court heard argument on J.L.W.'s pre-trial suppression motion. The parties agreed to incorporate Officer Chmura's suppression hearing testimony into the Commonwealth's adjudicatory hearing testimony in its case-in-chief. *See* N.T. Suppression/Adjudicatory Hearing, 7/23/19, at 92-93; *see also* N.T. Adjudicatory/Dispositional Hearing, 8/23/19, at 6.

pistol" to make it safe to handle. *Id.* at 11-12.[5] Officer Chmura testified that when he arrived on the scene, he asked J.L.W. "how could you do this . . . for all [Gaston] did for you.?" *Id.* at 43.

Officer Chmura transported J.L.W. to the local police department, unrestrained, in his police cruiser. At the station, he interviewed J.L.W. about the incident, with his mother present, after having administered J.L.W. his *Miranda*[6] rights. During the interview, J.L.W. admitted to taking the firearm from Gaston's residence, stating that he had done so for "protection." *Id.* at 21. Officer Chmura also testified that J.L.W. gave two written statements to the police; they were both introduced into evidence during the suppression hearing, with no objection by defense counsel. *Id.* at 22-23.[7] In the first statement, J.L.W. admitted to taking the gun, specifically stating, "L[.G.] had left the guns out of the safe and **I took one** thinking I could use it for protection." *Id.* (emphasis added). In a separate letter, J.L.W. wrote, "Hey, [Gaston]. This is me apologizing for **stealing from you**. I don't know what I was thinking when I did it, I hope you forgive me one day. No matter what, just know that I love you and the family." *Id.* at 22 (emphasis added).

_____

[5] Officer Chmura also testified that an armed, uniformed corporal arrived a couple seconds after he arrived on the scene. *Id.* at 38.

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[7] The Commonwealth noted at the adjudicatory hearing that it was "going to resubmit th[e four exhibits it entered at the suppression hearing] for the actual adjudication." N.T. Suppression/Adjudicatory Hearing, 7/23/19, at 77.

Following the pre-trial hearing, the court found that J.L.W. was in custody at the police department, where he was properly advised of his **Miranda** warnings prior to making any statements, and, thus, denied J.L.W.'s motion to suppress. **Id.** at 62. The court then proceeded to the first of two days of adjudicatory hearings, held on July 23, 2019[8] and August 23, 2019.

Gaston testified at the July 23, 2019 adjudication hearing that he received a text from his son, L.G., who told him "J.M. has a Beretta .40." N.T. Juvenile Hearing, 7/23/19, at 69. Gaston received that text two days after he noticed the gun was missing from the safe. After receiving the text, Gaston called J.L.W., who had spent the night at Gaston's house the day before Gaston realized his gun was missing. **Id.** Gaston asked J.L.W. "where he was at [sic]" and J.L.W. told he him he was at J.M.'s house. **Id.** Gaston then told J.L.W. that he "want[ed his] F-ing gun back now." **Id.** Gaston hung up the phone, called 9-1-1, and then called Officer Chmura on his personal cell phone to tell him that J.L.W. had stolen his firearm. **Id.** at 74-75. Officer Chmura met Gaston at J.M.'s residence. **Id.** at 11-12. When Gaston arrived at the scene, he received a text message from J.L.W. telling him that that gun was outside on the porch. **Id.** 77, 79.

Gaston further testified that L.G. and J.L.W. had been friends for 13 years, that he and his son had a close relationship with J.L.W., that he was a

_____

[8] The dates on the docket and on the transcript of the notes of testimony from the first adjudicatory hearing are inconsistent. For consistency purposes, we will use July 23, 2019, the date on the transcribed hearing notes, as the appropriate date.

- 4 -

father figure to J.L.W., and that J.L.W. spent at least one night a week at his house. *Id.* at 63-64, 81. Gaston also coached J.L.W. in high school football and wrestling. *Id.* at 82. Gaston testified that L.G. had access to his safe, which is operated by a keypad, and that he had given L.G. permission in the past to go into the safe. *Id.* at 65-66, 82.

After Gaston's testimony, the Commonwealth stated that it decided not to call L.G. as a witness,[9] and rested its case. At that time, J.L.W. orally moved for a judgment of acquittal. *Id.* at 92-93. The trial court denied the motion. *Id.* at 93. J.L.W. renewed his motion for judgment of acquittal at the beginning of the second day of the adjudicatory hearings. N.T. Adjudicatory/Dispositional Hearings, 8/23/19, at 6. The court denied the motion for a second time. *Id.* At the August 23, 2019 adjudicatory hearing, Officer Lehman and J.L.W. testified. Officer Lehman testified that on June 23, 2017, he responded to a call at 185 Logan Street in Sharon. When he arrived at the residence, Officer Lehman observed a black handgun on the front porch. *Id.* at 11. He photographed it, secured it, unloaded it, and placed it in his patrol vehicle. *Id.* Several other officers arrived on the scene. *Id.* at 12. At some point thereafter, J.L.W. came to the front porch of the house. *Id.* Officer Lehman testified that he was present when J.L.W. was read his rights

---

[9] The defense indicated that it intended to call L.G. at the continued adjudicatory hearing. However, only J.L.W. testified at the second hearing date. The defense rested its case immediately following his testimony. *See* N.T. Adjudicatory/Dispositional Hearing, 8/23/19, at 31.

at the police station and when he executed the ***Miranda*** waiver form, but that he did not participate in interviewing J.L.W. ***Id.*** at 13-14.

J.L.W. testified that on the day before the gun was reported stolen, Gaston had taken him and the entire high school football team to a football camp. J.L.W. testified that L.G. and J.M. also traveled with him and Gaston to the camp. ***Id.*** at 17. At the camp, J.L.W. testified that football players from another team tried to fight his team. ***Id.*** at 18. J.L.W. also testified that on the drive back from camp, he and some of his teammates, including L.G., discussed the situation with the other team in Gaston's car. ***Id.*** at 18-19. J.L.W. testified that he and his teammates received threatening text messages from the other team indicating that they had guns and that they were going to be in Sharon. ***Id.*** at 20. J.L.W. told L.G. about the threats and told L.G. that he was scared. ***Id.*** L.G. said that "if he could help [J.L.W.] in any way[,] that he would." ***Id.*** J.L.W. testified that he watched L.G. retrieve his father's gun from the safe and gave it to J.L.W. ***Id.*** at 21. J.L.W. testified that after L.G. gave him the gun, he went to J.M.'s house with it, but that he did not intend to keep the gun because he did not need it for more than a few days to protect himself. ***Id.*** at 22. J.L.W. testified that he only wanted the gun to scare off any opposing players that came to Sharon, and that he never planned to use the weapon. ***Id.*** at 25. J.L.W. also testified that he did not have permission from Gaston to take the firearm. ***Id.*** at 24.

After the defense rested, it recalled J.L.W. to the stand to question him about his written statements made to Officer Chmura at the police station.

On re-direct examination, J.L.W. admitted that he had, in fact, written those statements in which he "apologiz[ed] for stealing from [Gaston]" and indicated that "L.G. had brought the guns out of the safe." *Id.* at 41-42. J.L.W. noted that these statements were inconsistent with his prior testimony that he had not, in fact, stolen the gun, but that L.G. had given him permission to take it and handed the gun to him to keep for a few days for protection. *Id.* at 42. J.L.W. testified that at the time he made the statements, he was "confused . . . scared [and] never thought that this was going to happen as a result of having the gun." *Id.*

At the conclusion of the hearing, the court adjudicated J.L.W. delinquent, finding him guilty, beyond a reasonable doubt, of RSP, and not guilty of theft by unlawful taking and possession[10] of a firearm by a minor.[11] *Id.* at 43-44.[12] J.L.W. filed a timely post-dispositional motion on September 3, 2019. The trial court failed to rule on the motion, and also failed to enter an order deeming the order denied by operation of law after 30 days. *See* Pa.R.J.C.P. 620(B)(2)(b).[13] On February 3, 2020, J.L.W. filed a notice of

_____

[10] 18 Pa.C.S. § 3921(a).

[11] 18 Pa.C.S. § 6110(a).

[12] The court made two points before issuing its disposition: "First off, I do agree that the fact that Gaston never gave permission to [J.L.W.] speaks volumes. Number 2, the fact that [J.L.W.] wrote a letter apologizing speaks volumes and had he continued along that route, things may be different." *Id.*

[13] After several rules to show cause filed by this Court, the trial court ultimately determined that J.L.W. did, in fact, file a timely post-dispositional motion on

appeal.[14] He also filed a timely court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. J.L.W. presents the following issue for our consideration: "Did the [c]ourt abuse its discretion and commit an error of law by failing to grant [J.L.W.]'s [m]otion for [j]udgment of

_____

September 3, 2019, but acknowledged that it had not timely ruled on the motion in accordance with Pa.R.J.C.P. 620. We decline to accept the trial judge's invitation to dismiss J.L.W.'s appeal because he failed to file his notice of appeal within the proscribed 30-day appeal period after his motion *would have been* deemed denied by operation of law, despite no such entry of an order by the clerk of court denying of the post-dispositional motion under Rule 620. Pennsylvania Rule of Juvenile Court Procedure 620(B)(2)(b) clearly states that, "[]i]f a timely post-dispositional motion is filed, the notice of appeal shall be filed within thirty days **of the date of entry of the post-dispositional order denying the motion by operation of law in a case where the judge fails to decide the motion**[.]" Pa.R.J.C.P. 620(B)(2)(b) (emphasis added). Here, the trial court ultimately entered an order denying the post-dispositional motion by operation of law on June 30, 2020. **See** Pa.R.A.P. 108(a)(1) ("[T]he day of entry shall be the day the clerk of the court . . . mails or delivers copies of the order to the parties[.]"). To fault J.L.W. for the court's apparent operational breakdown and deny him the right to have his appeal decided on its merits is simply contrary to established precedent. **See Commonwealth v. B.H.**, 138 A.3d 15, 19 n.7 (Pa. Super. 2016) (when juvenile court took no action on juvenile's post-dispositional motions for months, juvenile's delay in filing appeal excusable due to breakdown in court's operations); **see also** Pa.R.J.C.P. 620 (Disposition) ("If the motion is deemed denied by operation of law, paragraph (D)(3) **requires that the clerk of courts enter an order denying the motion on behalf of the court and immediately notify the attorneys . . . that the motion has been denied. This notice is intended to protect the party's right to appeal.**") (emphasis added); **Id.** at (D)(3) ("When a post-dispositional motion is denied by operation of law, the clerk of courts **shall** forthwith enter an order on behalf of the court. Pursuant to Rule 167, the clerk of courts **shall** serve a copy of the order [deeming the post-dispositional motion denied by operation of law] upon each attorney and the juvenile, if unrepresented, that states the post-dispositional motion is denied.") (emphasis added).

[14] **See** Pa.R.A.P. 905(a)(5) ("notice of appeal filed after the announcement of a determination[,] but before the entry of an appealable order[,] shall be treated as filed after such entry and on the day thereof").

[a]cquittal and in finding [J.L.W.] guilty beyond a reasonable doubt?" Appellant's Brief, at 6.

J.L.W. contends that the Commonwealth did not meet its burden to prove his guilt for RSP where the "record is devoid of testimony evidencing [his] knowledge or belief that the firearm was stolen," Appellant's Brief, at 19, or of J.L.W.'s "intent to keep the gun." *Id.* Specifically, J.L.W. argues that the Commonwealth's only evidence regarding how J.L.W. obtained the firearm consisted of the testimony of Gaston, who testified that he had given his son, L.G., permission to enter his safe in the past.

"A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge and is granted only in cases where the Commonwealth fails to carry its burden regarding that charge." *Commonwealth v. Sunealitis*, 153 A.3d 414, 420 (Pa. Super. 2016). When reviewing a sufficiency of the evidence claim on an appeal from a dispositional order following an adjudication of delinquency, our standard of review is similar to the standard employed in criminal appeals alleging insufficient evidence. We review the evidence to support the adjudication of delinquency in the light most favorable to the Commonwealth as verdict winner. *See In re A.D.*, 771 A.2d 45, 48 (Pa. Super. 2001) (en banc).

> In reviewing the sufficiency of the evidence to support the adjudication below, we recognize that the Due Process Clause of the United States Constitution requires proof beyond a reasonable doubt at the adjudication stage when a juvenile is charged with an act which would constitute a crime if committed by an adult.

*Id.* (citations and quotation marks omitted).

J-A06021-21

Moreover,

[i]n a juvenile proceeding, the hearing judge sits as the finder of fact. The weight to be assigned the testimony of the witnesses is within the exclusive province of the fact finder. In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offenses beyond a reasonable doubt. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*In re L.A.*, 853 A.2d 388, 391 (Pa. Super. 2004) (citations omitted).

To sustain a conviction of receiving stolen property, the Commonwealth must establish that the defendant "intentionally receive[d], retain[ed], or dispose[d] of movable property of another **knowing that it has been stolen, or believing that it has probably been stolen**, unless the property is received, retained or disposed [of] with intent to restore it to the owner." 18 Pa.C.S. § 3925(a) (emphasis added). In **Commonwealth v. Stafford**, 623 A.2d 838 (Pa. Super. 1993) (en banc), our Court further elaborated on section 3925(a)'s element requiring knowledge of the property being stolen or belief that it has been stolen:

[W]e expressly rule that **the Commonwealth must first establish that the goods in question are actually stolen in order to sustain a conviction for receiving stolen property.** It is not enough that the Commonwealth proves only that: [(]1) [t]he defendant received property of another; and [(]2) [h]e received the property knowing it was stolen or believing it had probably been stolen. The Commonwealth also must establish that the property was actually stolen. By so ruling, we simply require the Commonwealth to continue to prove an element of the crime which "is both sound and firmly established in the case law[.]"

- 10 -

*Id.* at 840-41 (emphasis added). In ***Commonwealth v. Newton***, 994 A.2d 1127 (Pa. Super. 2010), our Court noted that a defendant cannot be found guilty of RSP "simply by retaining property that a reasonable person would conclude is probably stolen. Under the [current statute], the defendant must, at a minimum, harbor the personal belief that the item is probably stolen." *Id.* at 1131-32.

Instantly, J.L.W. testified at the adjudicatory hearing that: he watched L.G. remove the handgun from his father's safe in the basement; L.G. then gave the gun to J.L.W. and told him to keep it for a few days for protection; that he intended to return the gun after a few days; and J.L.W. knew he did not have permission from Gaston to keep the gun. N.T. Adjudicatory/Dispositional Hearing, 8/23/19, at 22-24, 30. However, consistent with Officer Chmura's testimony, J.L.W. also testified that he executed two written statements while in custody: in the first statement, J.L.W. admitted that he took a gun that "L[.G.] had left . . . out of [Gaston's] safe . . . thinking [he] could use it for protection;" and in the second statement, J.L.W. apologized to Gaston "for stealing from [him]."[15] Under

---

[15] The trial court also concluded that because J.L.W. retained the gun knowing it belonged to someone else and knowing he did not have Gaston's permission to keep the gun, he was guilty of RSP. We do not believe that J.L.W.'s admission that he took the gun without Gaston's permission, alone, proves that he also knew the gun was stolen or believed it was stolen for purposes of finding him guilty under section 3925. ***See Commonwealth v. Campbell***, 505 A.2d 262, 268 (Pa. Super. 1986) (en banc) ("For receiving stolen property, the act is receiving[.] **The mental element for receiving is that**

- 11 -

such circumstances, we conclude that the Commonwealth proved that J.L.W. "intentionally receive[d], retain[ed], or dispose[d] of movable property of another **knowing that it ha[d] been stolen, or believing that it ha[d] probably been stolen.**" 18 Pa.C.S. § 3925 (emphasis added). **See Commonwealth v. Robinson**, 128 A.3d 261, 268 (Pa. Super. 2015) (en banc) (circumstantial evidence of guilty knowledge may include "the defendant's conduct or statements at the time of arrest"); **see also Commonwealth v. Rippy**, 732 A.2d 1216 (Pa. Super. 1999) (factfinder free to conclude vehicle returned to owners only because police were able to recover it; factfinder free to believe defendant lied to owners when he indicated it was his intent to return vehicle). Thus, the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to establish the elements of RSP beyond a reasonable doubt. **In re L.A**, **supra**.[16]

Order affirmed.

---

**the defendant knew the property was stolen**."). However, because J.L.W. apologized to Gaston for "stealing" from him, admitting to the fact that the gun was stolen, we affirm the trial court's dispositional order. **See Commonwealth v. Thompson**, 778 A.2d 1215, 1223 n.6 (Pa. Super. 2001) (it is well settled that we may affirm trial court on different grounds).

[16] Despite the fact that J.L.W. testified that L.G. had permission to retrieve the gun from the safe and that L.G. gave the gun to J.L.W. for a few days for protection, the trial court as the finder of fact, determined the weight to be assigned to J.L.W.'s testimony. **Id.** We will not disturb these findings on appeal.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/9/2021</u>